**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RETAILMENOT, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 18-937-CFC-MPT |
| | : | |
| HONEY SCIENCE CORP., | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

On June 25, 2018, RetailMeNot, Inc. ("RetailMeNot"), filed this action alleging

infringement of U.S. Patent Nos. 9,626,688 ("the '373 patent"); 9,639,853 ("the '853

patent"); 9,953,335 ("the '335 patent"); and 9,965,769 ("the '769 patent") (collectively,

"the RetailMeNot Patents") by Honey Science Corp. ("Honey").[1]  On December 20,

2018, Honey filed its Answer to Complaint and First Amended Counterclaims alleging,

*inter alia*, infringement of U.S. Patent No. 10,140,625 ("the '625 patent" or "the Honey

Patent") (collectively, with the RetailMeNot Patents, "the patents-in-suit").[2]  On May 17,

2019, the parties filed a Joint Claim Construction Chart ("JCCC")[3] and, on August 14,

2019, filed Joint Claim Construction Briefs addressing the RetailMeNot Patents and the

Honey Patent ("Joint RetailMeNot Brief" and "Joint Honey Brief," respectively).[4]  The

court held a *Markman* hearing on August 27, 2019.[5]  The court recommends that the

District Court adopt the constructions as set forth below.

---

[1] D.I. 1.
[2] D.I. 28.
[3] D.I. 67.
[4] D.I. 109, D.I. 107.
[5] D.I. 112 (Tr. *Markman* hearing (Aug. 27, 2019)).

## I.    THE PATENTS-IN-SUIT

RetailMeNot's '853, '335, and '769 patents, titled "Devices, Methods, and

Computer-Readable Media for Redemption Header for Merchant Offers," and referred

to as the "Header Patents," are related and share a written description.[6]  The Header

Patents generally relate to assisting online shoppers with coupon redemption.[7]  The

Abstract of those patents recites:

> Devices, computer-implemented methods, and computer-readable media
> for a redemption header for merchant offers, such as online coupons, are
> provided.  In some embodiments, an offers website may provide offers,
> such as online coupons, in a browser executing on a user device.  When
> a user selects an online coupon, the browser is redirected to a merchant
> website associated with the online coupon and a coupon code value is
> copied to a clipboard.  Additionally, a redemption header having the
> coupon code and instructions is added in the merchant webpage.  A
> webpage element for the redemption header, such as an inline frame, is
> created in the merchant webpage and the redemption header is provided
> based on an offer identifier stored in a browser-accessible storage item
> such as a cookie.

RetailMeNot's '688 patent, titled "Method and System for Facilitating Access to a

Promotional Offer," and referred to as the "Click-to-Copy Patent," relates to the

redemption of online coupons, which merchants use to provide discounted prices or

other benefits to customers.[8]  The Abstract of that patent recites:

> A method of facilitating access to a promotional offer, the method
> comprising:  receiving at a server system a page request from a client
> device; and sending program code executable in a browser application to
> the client device in response to the page request, the program code being
> executable to display at least one promotional offer and a promotional
> code, to provide a flash object at a display position of the promotional
> code and, in response to selection of the flash object, to cause the

---

[6] D.I. 109 at vi.  The court will cite the '853 patent's written description.
[7] *Id.* at 49.
[8] *Id.* at vi; *id.* at 4.

promotional code to be copied to a user-accessible memory of the client device and to open a new browser display of the browser application.

Honey's '625 patent, titled "Systems and Methods for Interfacing with a Website to Modify Content," discloses a browser solution for automatically testing online coupon codes and applying the coupon code that results in the greatest savings.[9] The '625 patent Abstract recites:

> The field of the invention relates to systems and methods for interfacing with a third party website. In one embodiment, a computer system is configured to directly interface with a website via a webpage to change certain numerical values through the use of digital codes. The digital codes are applied to a data entry interface on the webpage, and the responses are monitored and transmitted back to a server system.

## II.    LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."[10] "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'"[11] Construing the claims in a patent is a question of law.[12]

Unless a patentee acts as his own lexicographer by setting forth a special definition or disavows the full scope of a claim term, the words in a claim are to be given their ordinary and accustomed meaning.[13] "[T]he ordinary and customary meaning of a

---

[9] D.I. 107 at 2.

[10] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

[11] *SoftView LLC v. Apple Inc.*, C.A. No. 10-389 (CONSOLIDATED), 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324).

[12] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996).

[13] *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."[14]  A person of ordinary skill in the art ("POSITA") "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[15]  "[T]he specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."[16]

The court may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."[17]  "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims."[18]  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct

---

[14] *Phillips*, 415 F.3d at 1313.

[15] *Id.*

[16] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). This court has previously observed:  "Section 112(b) of Title 35 provides that '[t]he specification shall conclude with one or more claims[.]'  This language makes clear that the specification includes the claims asserted in the patent, and the Federal Circuit has so held.  *See Markman*, 52 F.3d at 979 ('Claims must be read in view of the specification, of which they are part').  The Federal Circuit and other courts, however, have also used 'specification' on occasion to refer to the written description of the patent as distinct from the claims.  *See, e.g., id.* ('To ascertain the meaning of claims, we consider three sources:  The claims, the specification, and the prosecution history.')."  *IPC Sys., Inc. v. Cloud9 Techs. LLC*, C.A. No. 16-443-CFC, 2018 WL 5342654, at *1 n.1 (D. Del. Oct. 29, 2018).  As did the court in *IPC Sys.*, this Report and Recommendation will refer to the portion of the specification that is not the claims as "the written description" to avoid confusion.

[17] *Phillips*, 415 F.3d at 1317.

[18] *Markman*, 52 F.3d at 981.

construction."[19]

Five disputed terms are alleged to be indefinite.  The claims of a patent must
"particularly point[] out and distinctly claim[] the subject matter" regarded as the
invention.[20]  In determining whether challenged claims meet this requirement, the court
must strike the "delicate balance" that tolerates "[s]ome modicum of uncertainty"
necessitated by "the inherent limitations of language" yet at the same time ensures that
"[the] patent [is] . . . precise enough to afford clear notice of what is claimed[.]"[21]
Accordingly, "a patent is invalid for indefiniteness if its claims, read in light of the [written
description] delineating the patent, and the prosecution history, fail to inform, with
reasonable certainty, those skilled in the art about the scope of the invention."[22]

III.    AGREED-UPON CONSTRUCTIONS

In the JCCC, the parties agree that the preamble of the asserted claims of the
'625 patent is limiting.[23]  The parties also agree on the construction of the following
terms in '853 patent:  "selection of one of the plurality of offers" means "selection of one
of the plurality of electronic coupons," and "offer redemption identifier" and "offer
identifier" mean "identifier associated with an offer that enables or describes the
redemption of the offer."[24]  The parties agree the term "website" recited in the '853,
'335, and '769 patents means "a collection of [. . .] webpages" (noun) or "[. . .] of a

---

[19] *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).
[20] 35 U.S.C. § 112.
[21] *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014) (citations omitted).
[22] *Id.* at 901.
[23] D.I. 67 at 1.
[24] D.I. 109 at 4; D.I. 67 at 1.

collection of webpages" (adj.)."[25]  The parties agree the term "automatically," recited in

the '688 patent means "[copy[] the coupon code and send [] a second serve request]

without human intervention."[26]  The court recommends accepting the parties' agreed-

upon constructions for purposes of this litigation.

## IV.    COURT'S CONSTRUCTION OF DISPUTED CLAIM TERMS

Nine disputed terms are found in the RetailMeNot Patents and three disputed

terms are found in the Honey Patent.

Before addressing the parties' specific proposed constructions, the court notes

that many of RetailMeNot's proposals are for the court to ascribe the "plain and ordinary

meaning" to the disputed term, i.e., provide no construction.  Although the court

ultimately accepts certain of RetailMeNot's arguments, the difficulty with its position in

general is the parties do not agree on what that "plain and ordinary meaning" is.  Thus,

under *O2 Micron Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, the court is faced with

accepting no construction, or considering the definition by the party proposing an actual

definition.[27]  Also, RetailMeNot largely supports its suggestion that certain terms be

given their "plain and ordinary meaning" by citing extrinsic evidence for terms that do

not necessarily suggest such meaning, unlike "automatically" which the parties agree, in

one instance, or do not dispute, in the other instance, are easily understood to mean

"without human intervention."

---

[25] D.I. 109 at 4.

[26] *Id.*

[27] 521 F.3d 1351, 1361 (Fed. Cir. 2013) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute. . . .").

**A.** "feedback portion" ('688 patent, claim 1)

    1.    RetailMeNot's proposed construction:  plain and ordinary meaning

    2.    Honey's proposed construction:  "part of the webpage inviting user input"

    3.    Court's construction:  "part of the webpage inviting user input."

The court's recommendations of the constructions for "feedback portion" and "[feedback portion] indicative of historical user's views on the content" are discussed together, below.

**B.** "[feedback portion] indicative of historical user's views on the content" ('688 patent, claim 1)

    1.    RetailMeNot's proposed construction:  plain and ordinary meaning

    2.    Honey's proposed construction:  "[feedback portion] indicating previously posted user comments in relation to content"

    3.    Court's construction:  "indicative of historical user's views on the content"

RetailMeNot contends the entire phrase "feedback portion indicative of historical user's views on the content" should be given its plain and ordinary meaning and not, as Honey suggests, be separately defined as two terms, "feedback portion" and "indicative of historical user's views on the content."[28]  Honey does not agree that either the two separate terms, or the entire phrase, has a plain and ordinary meaning.

RetailMeNot frames the dispute over these terms as involving two issues:  (1) whether the feedback *invites* user feedback (Honey's position) or whether it only *indicates* previous user feedback to the present user (RetailMeNot's position); and (2)

---

[28] D.I. 112 at 9:7-24.

whether "indicative of historical user's views on the content" should be restricted to the form of *previously posted comments* (Honey's position) or encompasses many of the *other forms of user feedback* disclosed in the written description (RetailMeNot's position).[29]

The court determines that the entire "feedback portion" phrase of the '688 patent is not susceptible to a plain and ordinary meaning and that "feedback portion" and "indicative of historical user's views on the content" should be separately construed.

RetailMeNot argues the "feedback portion" phrase is defined expressly by the claim language.[30] The court disagrees. "Feedback portion" is neither a commonly understood term, nor expressly defined by claim language. RetailMeNot acknowledges,[31] and the claim language is unambiguously clear, that the "content item" of claim 1 comprises three distinct elements:

> . . . a content item comprising:
>
>> *a display portion* overlaid with a coupon code and a flash object or other object having associated therewith script or code permitted by the browser application to copy characters to a clipboard memory of the client computing device,
>>
>> *a description* of the content, and
>>
>> *a feedback portion* indicative of historical user's views on the content[.]"[32]

With regard to the first issue identified by RetailMeNot, whether the feedback *invites* user feedback (Honey's position) or whether it only *indicates* previous user

---

[29] *Id.* at 10:1-13.
[30] *Id.* at 10:14-16.
[31] *Id.* at 10:16-20.
[32] '688 patent, claim 1 (all emphases added unless otherwise noted).

feedback to the present user (RetailMeNot's position), the court determines Honey's

position is correct.  RetailMeNot's position conflates the distinct limitations "feedback

portion" and "display portion."  In asserting the entire phrase "feedback portion" should

be given its plain and ordinary meaning, RetailMeNot contends the claim language itself

defines the feedback portion, i.e., that it is indicative of historical (or previous) user's

views on the content.[33]  Its support for that position, however, is the written description's

discussion of the *display portion*.[34]  RetailMeNot also points to the illustration in Figure

2, and accompanying written description, of a success rate display and histogram

revealing previous historical user votes to support its position.  This evidence again

pertains to the display portion.[35]  Thus, court determines RetailMeNot is incorrect in its

assertion that the claim language, and purported supporting written description, defines

the entire "feedback portion" term.

   Honey's proposed construction of "feedback portion," "part of the webpage

inviting user input," is supported by the claim language and written description.  Claim 1

---

[33] D.I. 112 at 10:22-11-1.

[34] '688 patent, 5:16-30 ("The *display portion 210* further comprises a statistical information *display* section 230 that provides information regarding the efficacy of the promotional offer . . . .  In some embodiments, the statistical information 230 may comprise a histogram 232 representative of the historical user votes received . . . .  The histogram 232 may comprise a number of bars displayed in series and indicative of the number and value . . . of user votes on the perceived reliability or redeemability of the promotional offer.").

[35] *See* '688 patent, Fig. 2 (illustrating "Stats:  73% Success rate"); 5:15-30 ("The *display portion 210* further comprises a statistical information display section 230 that provides information regarding the efficacy of the promotional offer . . . .  In some embodiments, the statistical information 230 may comprise a histogram 232 representative of the historical user votes received in relation to the particular promotional offer [and] may comprise a number of bars displayed in series and indicative of the number and value . . . of user votes on the perceived reliability or redeemability of the promotional offer.").

makes clear "feedback portion" is distinct from "display portion."  Likewise, Figure 2 and

the written description demonstrate this distinction.  Figure 2 illustrates two separate

boxes identified as 210 and 220, and described in the written description as:  "[t]he

*display portion 210* comprises a promotional code 212, also referred to as a coupon

code, and a description 218 of the promotion[,]" and "*Feedback portion 220* comprises

text 222 inviting feedback in relation to the promotional offer and positive and negative

voting buttons 224, 226."[36]  The written description uses feedback to mean user input:

"The promotional offer may be displayed in conjunction with a *feedback section*

configured *to allow a user to provide feedback input* in relation to the promotional

offer[.]"[37]

RetailMeNot's argument that Honey improperly relies on a preferred embodiment

is unavailing because that embodiment provides confirmation of the distinction between

the feedback and display portions.  The written description nowhere suggests a

conflated embodiment of the feedback and display portions.  The court also rejects

RetailMeNot's argument that claim 2, reciting "[t]he system of claim 1, wherein the

feedback portion comprises a positive and negative voting button . . ." adds to the

feedback portion a positive and negative voting button, e.g., that claim 1 is presenting

---

[36] '688 patent, 5:14-16; 5:65-66.  *See also, e.g.*, *id.*, 4:56-67 ("Database 130 may comprise a localised or distributed database storing data records for the various promotional offers, as well as user *feedback (if any) received* in relation to each promotional offer."); *id.*, 4:62-67 ("Database 130 may also be used by server system 110 to store data regarding the number of times a promotional offer is selected and may store data for the purpose of rating or ranking the various promotional offers *according to user feedback* and/or other measures of efficacy or reliability of the promotional offers.").
[37] *Id.*, 2:30-33.

user feedback from previous users and then claim 2 adds the solicitation of feedback from the present user.[38]  Claim 1 invites feedback from the present user; claim 2 describes a specific manner in which that feedback is invited or received. Consequently, the court recommends construing "feedback portion" to mean "part of the webpage inviting user input."

The second issue identified by RetailMeNot is whether "indicative of historical user's views on the content" should be restricted to the form of *previously posted comments* (Honey's position) or encompasses many of the *other forms of user feedback* disclosed in the written description (RetailMeNot's position).  The court has determined the entire "feedback portion" phrase is not amenable to a plain and ordinary meaning.  The court determines, however, the written description does not limit the separate phrase "indicative of historical user's views on the content" to previously posted comments as Honey suggests, and it is appropriate to provide no additional definition other than the words themselves:  "indicative of historical user's views on the content."

As an initial matter, Honey notes the claim language "historical user's" is singular possessive, not plural possessive, and thus the term must reflect an individual user's comments related to the content.[39]  In response, RetailMeNot posited, "I think a lot of people don't know how to use a apostrophes.  If it's singular it would be [']an['] historical user's view on the content."[40]  Here, the court does not believe the construction of this

---

[38] D.I. 112 at 14:23-15:16.
[39] *Id.* at 24:7-12.
[40] *Id.* at 28:18-21.

term hinges on apostrophe placement and, in any event, that placement does not indicate whether the phrase is limited to previously posted comments.

Next, in the phrase "feedback portion *indicative of historical user's views on content*," the italicized language modifies "feedback portion," not the separate "display portion" limitation. Yet, RetailMeNot relies on the written description's explanation of the display portion for its position that "indicative of historical user's views" encompasses other forms of user feedback such as efficacy, user success rate, user perceived reliability, aggregated positive and negative endorsements or votes from users, and other statistical information.[41]

For its part, Honey relies on the written description's explanation that:

> Feedback portion 220 comprises text 222 inviting feedback in relation to the promotional offer and positive and negative voting buttons 224, 226. Feedback portion 220 _may also comprise a selectable link or button to display previously posted user comments in relation to the promotional offer to allow qualified users to post further feedback_.[42]

Honey's position improperly limits the phrase to a preferred embodiment included in a section of the written description that, while discussing the feedback portion, states the feedback portion comprises text "inviting feedback," "positive and negative voting buttons", and _"may also_ comprise a . . . link or button to display previously posed user comments." The written description does not, and need not, provide the universe of specific sources "indicative of historical user's views on the content," but it clearly does not limit those sources to comments. The court recommends no additional definition for this phrase and it be given the plain and

---

[41] '688 patent, 5:16-30 (describing "display portion 210").
[42] *Id.*, 5:64-6:3.

ordinary meaning as expressed by the words of the claim: "indicative of historical

user's views on the content."

> **C.** "display portion overlaid with a coupon code and a flash object or other
> object" ('688 patent, claim 1)
>
>> 1. RetailMeNot's proposed construction: plain and ordinary meaning
>>
>> 2. Honey's proposed construction: "a coupon code and a flash object
>> or other object together overlaying a part of the displayed
>> webpage"
>>
>> 3. Court's construction: "a coupon code and a flash object or other
>> object together overlaying a part of the displayed webpage"

The dispute with this term is whether the definition requires "a coupon code and

flash object or other object" that "together overlay[] a part of the displayed webpage,"

e.g., does the "coupon code" have to overlay in some part with the "flash object or other

object." The answer to this question is whether, as Honey maintains, the prosecution

history reveals a clear and unmistakable disclaimer.[43]

The claim language itself does not suggest a spacial requirement between a

"coupon code" and "flash object or other object." Turning to the written description,

Figure 2 illustrates flash object 213 that does overlap a coupon code 212. "Display

portion 210 further comprises a flash object 213, such as an empty flash movie, that is

transparent and overlaid on the promotional code 212. Alternatively, flash object 213

may comprise one or more images that display the promotional code 212."[44]

---

[43] *See, e.g.*, *Mass. Inst. of Tech. v. Shire Pharms. Inc.*, 839 F.3d 1111, 1119
(Fed. Cir. 2016) ("'[I]n order for prosecution disclaimer to attach, the disavowal must be
both clear and unmistakable.'") (alteration in original) (quoting *3M Innovative Props. Co.
v. Tredegar Corp.*, 725 F.3d 1315, 1325 (Fed. Cir. 2013)).
[44] '688 patent, 5:31-34.

RetailMeNot acknowledges the potential of overlap but asserts this description of a preferred embodiment does not require that overlap.[45]  Honey's position, however, is that during prosecution of the parent application of the '688 patent, the patentee argued that the "coupon code" and the "flash object or other object" must at least partially overly the same part of the webpage in distinguishing prior art.[46]

The court first notes that the '688 patent is properly held to disclaimer "arguments in the parent application."[47]  During prosecution of the parent application, the applicant distinguished prior art by CouponMountain.com:

*CouponMountain.com, however, teaches a flash object for copying promotional codes* 1) the selection of which does not cause copying of the code to the clipboard because the flash object is not embedded until after the selection, and *2) is not overlaid on a display portion associated with a coupon code*.  Rather, as explained below, CouponMountain.com teaches a simple image object that the user selects to copy a coupon code, and the image object then launches a script that embeds a <u>flash object</u>, after the selection, and <u>in a different portion of the webpage from the image object</u>.  As such, CouponMountain.com cannot teach or suggest "the copying to the clipboard memory being caused at least in part by the selection of the flash object," or "a display portion associated with a coupon code and overlaid with a flash object."[48]

Further, *the flash object of CouponMountain.com is not in the position recited by the independent claims:  overlaid on "a display portion associated with a coupon code."*  As noted above, the flash object is

---

[45] D.I. 112 at 34:8-35:3.

[46] D.I. 109 at 22-23, *id.* at 27, 27 n.1.

[47] *See Hakim v. Cannon Avent Grp., LLC*, 479 F.3d 1313, 1316-18 (Fed. Cir. 2007) (finding that the district court did not err in holding applicant to arguments made during prosecution of the parent application and explaining that "[a]lthough a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited") (citation omitted).

[48] D.I. 67-3, ex. 11 (U.S. Pat. No. 8,612,288 File History), Resp. to Office Action dated June 25, 2013, at 11 (italics added, underlining in original).

embedded in the flashcopier object, the position of which appears to be unrelated to the image tag selected by the user and is not overlaid on "a display portion associated with a coupon code."[49]

Honey contends the prosecution arguments demonstrate a clear and unmistakable disavowal of claim scope thereby requiring the "coupon code" and the "flash object or other object" together must at least partially overlay the same part of the webpage.  The court agrees with Honey.

The applicant distinguished CouponMountain.com by stating that prior art teaches "a flash object for copying promotional codes . . . [that] is not overlaid on a display portion associated with a coupon code[,]" and that "the user selects [an image object] to copy a coupon code, and the image object then launches a script that embeds a flash object, after <u>the selection</u>, and <u>in a different portion of the webpage</u> from the image object."  Notably, the patentee supplied the emphasis by underlining that CouponMountain.com taught a flash object embedded in a different portion of the webpage, and distinguished that teaching from their invention with the statement that "the flash object of CouponMountain.com is not in the position recited by the independent claims:  overlaid on 'a display portion associated with a coupon code.'"  In the Notice of Allowability for both the parent application and the '688 patent, the examiner specifically included "using Flash overlaying coupon codes" among the reasons for allowance:

> The following is an examiner's statement of reasons for allowance:  The independent claim of the present invention recites a method of operating a coupon-sharing website in an affiliate network, the coupon-sharing website facilitating user coupon redemption by loading a user selected

---

coupon code into a clipboard memory of a client computing device for pasting into a coupon redemption input of a retailer, using multiple requests in a commercial affiliate network, *maintaining feedback of coupon usage and reliability while using Flash overlaying the coupon codes*, where Flash activation initiates the automatic copy and paste function of the code all done in a secure environment of the webpage.[50]

Thus, the court recommends construing "display portion overlaid with a coupon code and a flash object or other object" to mean "a coupon code and a flash object or other object together overlaying a part of the displayed webpage."

**D.**    "secure sandbox" ('688 patent, claim 1)

    1.    RetailMeNot's proposed construction:  plain and ordinary meaning or, alternatively, "environment with restricted privileges which at least prohibits access to the clipboard of the client computing device or another similar user-accessible memory"

    2.    Honey's proposed construction:  "environment with restricted privileges which at least prohibits access to the clipboard of the client computing device"

    3.    Court's construction:  "environment with restricted privileges which at least prohibits access to the clipboard of the client computing device"

The dispute with this term is whether the claimed secure sandbox requires preventing access to the clipboard only (Honey's position) or more broadly also prohibit access to "another similar user-accessible memory" (RetailMeNot's position).

RetailMeNot in part relies on extrinsic evidence, from the parties' experts and technical dictionaries, to support its proposed construction.  That evidence is not particularly helpful in construing this term in the context of the '688 patent because

---

[50] D.I. 67-3, Ex. 11 (U.S. Pat. No. 8,612,288 File History) Examiner's Amendment, at 2-3; *see also id.*, Ex. 11 ('688 patent File History) Examiner's Amendment, at 6 (same).

each generally describe, and the parties' proposed constructions recognize, a secure

sandbox as an environment with restricted privileges which prohibits, or restricts, certain

areas of a client computing device.

The "secure sandbox" term appears in the following limitation from claim 1:

> *copying* the coupon code *from* within a *secure sandbox* of the browser
> application *to* the *clipboard memory of the client computing device*, the
> copying to the clipboard memory being caused at least in part by the
> selection of the flash object or other object.[51]

Claim 1 contains an additional reference to the permissions related to the clipboard:

> a display portion overlaid with a coupon code and a flash object or other
> object having associated therewith script or code permitted by the browser
> application to copy characters to a clipboard memory of the client
> computing device[.][52]

The claim language, therefore, supports the limitation Honey promotes as there

is no language reciting "another similar user-accessible memory" to support the broader

scope RetailMeNot proposes.

In view of the understanding that a secure sandbox is generally understood to

involve prohibiting access to certain areas of a client computing device, the only portion

of the written description that speaks to such prohibitions does so with reference to a

clipboard.

> For computer security reasons, copying of code into a clipboard of a client
> computing device 120 is generally not permitted by many client browser
> applications 125.  However, this prohibition against copying to the
> clipboard does not exist in relation to selection of a flash object, such as
> flash object 213.[53]

---

[51] '688 patent, claim 1.
[52] *Id.*
[53] *Id.*, 8:5-10.

During prosecution of the parent application, the patentee also discusses this aspect of the secure sandbox.

> At the time of filing, those of skill in the art understood that web browsers operate within a *secure sandbox*, preventing arbitrary execution of code from untrusted webservers, as demonstrated in part by the above-cited portions of Hertel at paragraphs 153 and 180. *And the present application explains on page 14 lines 5-7 that "[f]or computer security reasons, copying of code into a clipboard of a client computing device 120 is generally not permitted by many client browser applications." The pending application further explains, however, that "this prohibition against copying to the clipboard does not exist in relation to the selection of a flash object,"* on page 14, lines 7-8.[54]

Portions of the written description cited by RetailMeNot that recite "another, or other, similar user-accessible memory" are not related to restrictions or prohibitions of a secure sandbox.

> Further, *some embodiments* contemplate using an object other than a flash object as the basis for copying the promotional code, where that other object has associated therewith script or code that would be permitted by the browser application to copy characters to the clipboard or *another similar user-accessible memory*.[55]

Thus, the court recommends construing "secure sandbox" to mean "environment with restricted privileges which at least prohibits access to the clipboard of the client computing device."

    **E.**    "content item" ('688 patent, claim 1)

        1.    RetailMeNot's proposed construction: plain and ordinary meaning, or "unit of information in a webpage"

---

[54] D.I. 67-3, Ex. 11 (U.S. Pat. No. 8,612,288 File History), Resp. to Office Action dated Feb. 5, 2013, at 20.

[55] '688 patent, 8:30-36; *see also id.* 1:45-59, 5:47-64. To the extent RetailMeNot argues these passages do somehow contemplate secure sandbox restricting access to "another similar user-accessible memory," such embodiment is an unclaimed embodiment not covered by claim 1.

2. Honey's position:  indefinite

3. Court's construction/[determination]:  "unit of information in a webpage"

Because Honey contends this term is indefinite, the court must determine whether the intrinsic record "inform[s], with reasonable certainty, those skilled in the art about the scope of the invention."[56]

Claim 1 recites, in relevant part:

memory storing instructions that when executed by the one or more processors effectuate operations comprising:

receiving, from a client computing device, at a content-sharing website server, one or more serve requests for *web content items*;

sending, in response to the one or more serve requests, from the content-sharing website server, the *web content items* to the client computing device;

receiving, with the client computing device, the *web content items*;

executing, with the client computing device, instructions included with the *web content items* and thereby effectuating operations comprising:

displaying a web-page specified by the *web content item* at the client computing device in a browser application of the client computing device, the web-page having a *content item* comprising:

a display portion overlaid with a coupon code and a flash object or other object having associated therewith script or code permitted by the browser application to copy characters to a clipboard memory of the client computing device,

a description of the content, and

a feedback portion indicative of historical user's views on the content[.][57]

---

[56] *Nautilus, Inc.*, 572 U.S. at 901.
[57] '688 patent, claim 1.

Claim 1 thus describes a system that effectuates the following operations: (1) "a content sharing website server" receives "serve requests for web content items" from a "client computing device"; (2) the server "send[s] . . . web content items to the client computing device"; (3) the client "receives . . . [those] web content items"; and (4) the client "executes . . . instructions included with the web content items" to, among other things, "display[] a webpage . . . having a content item comprising" content as recited in the claim.[58]

RetailMeNot argues it would have been apparent to a POSITA that the "web content items" of claim 1 contain at least one discrete content item that relates to the portions of the webpage addressed in subsequent claim limitations.[59]

It asserts a POSITA would also understand "content item" to have a definite meaning in light of the patent written description, which explains that the disclosed embodiments are described in the context of a browser application that "receives code from a web server" and that the code, when executed by the browser application, "display[s] the requested web page."[60] In this context, a POSITA would appreciate that code received from a web server and executable by a browser–or "web content"–would be made up of discrete items of content.[61] The system disclosed in the written description also includes a browser that can "request content [from a server system], in the form of one or more web pages provided as program code executable by the

---

[58] D.I. 109 at 37 (RetailMeNot describing the system of claim 1).
[59] *Id.*
[60] *Id.* at 38 (quoting '688 patent, 3:27-38).
[61] D.I. 110-1, ex. A (Polish Decl.) ¶ 45.

browser application 125."[62]  That "content" includes information contained in the webpages, and the written description describes the elements of a webpage, making clear numerous content "items" make up the webpage.[63]

Honey argues the claims and the written description of the '688 patent fail to inform a POSITA what objective boundaries define a "content item."[64]

The court notes that two of the cases Honey emphasizes that found claim terms indefinite addressed units of measurement from other scientific fields the court finds inapposite to the present dispute.[65]  The court notes that in one of those cases, *Butamax*, the court declined to determine indefiniteness at the claim construction stage and made that determination on summary judgment.[66]  Other cases relied upon by Honey determined indefiniteness at later stages in the litigation.[67]

---

[62] D.I. 109 at 38 (quoting '688 patent, 4:5-9).

[63] *Id.* (quoting, e.g., '688 patent, 5:8-13, 5:45-49, 6:23-39).

[64] *Id.* at 39.

[65] *See Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, C.A. No. 15-8149-LPS-CJB, 2017 WL 3331739 (D. Del. Aug. 4, 2017) (claim covered a molecule of a specified molecular weight but it was unclear which measure of molecular weight applied in the context of the patent), *report and recommendation adopted*, 2017 WL 5172396 (D. Del. Nov. 8, 2017); *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 117 F. Supp. 3d 632 (D. Del. 2015) (claim covered a particular amino acid sequence having a specified % identity but the written description described multiple methods to calculate % identity which yield different results).

[66] In its opinion, the *Butamax* court noted it had "construed the limitation 'having at least 95% identity to' as 'at least 95% of amino acid units in the sequence match in an alignment with a reference sequence,' but left open the question of indefiniteness for a substantive motion practice after discovery."  *Id.* at 639 (citing *Butamax Advanced Biofuels LLC v. Gevo, Inc.*, C.A. No. 12-1036-SLR-SRF, D.I. 203 (claim construction order at 2) ("Whether a person  of skill in the art would reasonably be apprised of the limitations of the invention in the case at bar, however, is better left to a substantive motion practice after discovery.")).

[67] *See, e.g.*, *Hip, Inc. v. Hormel Foods Corp.*, C.A. No. 18-615-CFC, 2019 WL 2579266, at *1 (D. Del. June 24, 2019) (decided after the court "permitted Defendants to move on an expedited basis for summary judgment on its counterclaim that the #610

*Integra Lifesciences*, on the other hand, was decided at the claim construction stage but, there, the parties "presented dueling opinions as to the question, the parties have fully joined the issued, and they have had a full, fair opportunity to litigate it" at the claim construction stage.[68] Here, the parties have also submitted dueling expert opinions, however, the court does not find the expert's opposing submissions to be sufficient to establish by clear and convincing evidence at this stage that the term is indefinite as Honey suggests. As explained below, the court finds there is sufficient evidence in the intrinsic record to construe the term but leaves open possible reassessment of invalidity at a later stage of the litigation.

Although "content item" does not appear in the written description, RetailMeNot points to disclosure of "displays 200" as adequately revealing the scope of the invention.[69] The written description recites:

> At step 310, in response to the serve request, server system 110 serves page code to client browser application 125 over network 115. The page code includes HTML code and applets and/or JavaScript to provide one or more displays 200. This page code is then executed by the client browser application 125 at step 315 to display images for one or more promotional offers, such as display 200. The HTML code to provide display 200 may

---

patent is indefinite and consequently invalid under 35 U.S.C. § 112."); *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620 (Fed. Cir. 2015) (Federal Circuit review after jury determination of indefiniteness); *Acacia Media Techs. Corp. v. New Destiny Internet Grp.*, 405 F. Supp. 2d 1127 N.D. Cal. 2005) (court reached a tentative conclusion on indefiniteness and invited submission of extrinsic evidence on what a POSITA would understand the terms to mean when read in light of the patent written description, after which the parties submitted briefs and expert declarations).

[68] *Integra Lifesciences*, 2017 WL 3331739, at *3 (citations omitted). *Ethicon LLC v. Intuitive Surgical, Inc.*, C.A. No. 17-871-LPS, 2018 WL 6831169, at *11 (D. Del. Dec. 28, 2018), also determined indefiniteness at the claim construction stage, with each party presenting expert declarations from which the court determined indefiniteness was shown by clear and convincing evidence.

[69] D.I. 112 at 67:2-68-16; D.I. 109 at 38, 43.

have approximately 30 the following form: [code].[70]

RetailMeNot also highlights the written description's explanation of Figure 2 as disclosing an item of content.[71]

> Referring in particular to FIG. 2, the example display 200 of a promotional offer is described in further detail. Display 200 may be provided as one of a series of such displays on a single page displayed using HTML and other program code executed by browser application 125. Each display 200 comprises a display portion 210 and a feedback portion 220. The display portion 210 comprises a promotional code 212, also referred to as a coupon code, and a description 218 of the promotion.[72]

This description includes the three elements comprising a "content item" as required by claim 1: a display portion, a feedback portion, and a description. The court agrees with RetailMeNot that this is an example of the "content item" and would be understood by a POSITA to refer to a discrete item in a webpage having those attributes[73] and, therefore, accepts RetailMeNot's alternative construction of "content item."[74] Thus, the court recommends construing "content item" to mean "a unit of information in a webpage."

> **F.** "webpage" ('853 patent, claims 1-2, 4-5, 7, 10, 15, 17, and 19; '335 patent, claims 1, 9-12, 15, 18, 25, 27-28, and 31; '769 patent, claims 1, 3, 5, 11-14, 20-21, 25, and 30)

---

[70] '688 patent, 6:23-39.
[71] D.I. 112 at 67:15-18.
[72] '688 patent, 5:8-16.
[73] D.I. 112 at 68:10-13.
[74] Honey contends RetailMeNot's alternative construction is too broad but "the inference of indefiniteness simply from the scope finding is legally incorrect: 'breadth is not indefiniteness.'" *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) (citation omitted). The court recognizes "[b]readth defined in the language of the patent is permitted. Breadth stemming from ambiguity is not," *Int'l Test Sols., Inc. v. Mipox Int'l Corp.*, C.A. No. 16-cv-791-RS, 2017 WL 1367975, at *5 (N.D. Cal. Apr. 10, 2017). Here, the court determines on the current record RetailMeNot's alternative construction does not stretch the meaning of the term to ambiguity.

1.  RetailMeNot's proposed construction: "a collection of resources to be rendered by the browser and associated plug-ins, including execution scripts, such as JavaScript™, invoked by the webpage"

2.  Honey's proposed construction: "a collection of resources to be rendered by the browser and associated plug-ins identified at one page at a URL"

3.  Court's construction: "a collection of resources to be rendered by the browser and associated plug-ins, including execution of scripts, such as JavaScript™, invoked by the webpage"

"It is well-established that a patentee may set out a definition of a term and act as his own lexicographer."[75]  To act as his own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning.[76]

The written description contains a clear definition of "webpage":

> The Illustrated web server 18 may be configured to receive requests for offers interfaces encoded in a webpage (e.g., *a collection of resources to be rendered by the browser and associated plug-ins, including execution of scripts, such as JavaScript™, invoked by the webpage*).[77]

RetailMeNot's proposed construction tracks this language verbatim.  When Honey's expert was asked if he "underst[ood] statement in column 9 lines 8-10 in parentheses to be an example of a patentee acting as his own lexicographer by providing, in this case, a definition for the term 'Web page'?", he answered, "I do."  When asked to confirm his answer:  "Q.  Just to make sure I heard that correctly, you said you do, correct?  A.  Right."[78]

---

[75] *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1023 (Fed. Cir. 2017) (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).
[76] *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).
[77] '853 patent, 9:6-10.
[78] D.I. 110-1 at 65:3-11.

The parties' initially-proposed constructions each include "a collection of resources to be rendered by the browser and associated plug-ins[.]" At oral argument, however, Honey stated it was not opposed to the language "including execution scripts, such as JavaScript™" from RetailMeNot's proposal.[79] Thus, the dispute is over Honey's insistence that "a collection of resources . . ." must be narrowed by defining the term to include "identified at one page at a URL."

The court determines the written description does not require that narrowing definition. Excluding Honey's proposal does not remove the potential that a webpage may come from a URL, as RetailMeNot acknowledges.[80] However, there is no requirement that such limitation must be included in the definition. Portions of the written description cited by Honey indicate a webpage coming from one URL is optional,[81] and Honey's citation to extrinsic evidence in the form of expert testimony or RetailMeNot's technology tutorial does not persuade the court to deviate from the patentee's clear definition. Thus, the court recommends construing "webpage" to mean "a collection of resources to be rendered by the browser and associated plug-ins, including execution of scripts, such as JavaScript™, invoked by the webpage."

---

[79] D.I. 112 at 104:11-14.
[80] *Id.* at 97:11-15.
[81] *See, e.g.*, '853 patent, 22:37-41 ("*In some cases*, the header is reloaded with each merchant web page, or executes a script with each loaded merchant web page to determine whether the web page is a checkout webpage in which the code may be applied, e.g., by detecting the presence of keywords, such as "shipping information," or "checkout," in the webpage or a portion of *a URL of the webpage* know to correspond with the merchant's checkout webpage."); *id.*, 24:48-8-10 (" *For example*, if an order confirmation webpage is detected, *e.g., based on a requested URL* in a GET request, then in response, the user feedback text 496 and feedback buttons 498 may be provided in the redemption header 446.").

**G.** "webpage element of the merchant webpage" ('853 patent, claims 1, 9, and 19-20)

      1.    RetailMeNot's proposed construction:  plain and ordinary meaning

      2.    Honey's proposed construction:  "part of the webpage from the merchant's server(s) that displays information and/or receives user input"

      3.    Court's construction:  "webpage element of the merchant webpage"

RetailMeNot describes the two disputes concerning this term as:  (1) whether the webpage element must be "from the merchant's server(s)," or can also come from other servers or computers, and (2) whether the webpage element is limited to elements that "display[] information and/or receive[] user input."[82]

"Webpage element" is recited in the following limitation of claim 1 of the '853 patent.

> inserting, with one or more processors, a redemption bar in a *webpage element of the merchant webpage* upon determining that the offer identifier is stored in the storage item, the redemption bar including the offer redemption identifier associated with the selected offer, the redemption bar being displayed on the merchant webpage.[83]

RetailMeNot offers extrinsic evidence from its expert and technical dictionaries to suggest a POSITA would generally understand "webpage element" to be "a hierarchical component of a webpage that can be collected and nested within an HTML document" and/or "[i]n HTML, a distinctive component of a document's structure, such as a title, heading, or list," e.g., elements from which a webpage is constructed.[84]

---

[82] D.I. 112 at 122:14-24.

[83] '853 patent, claim 1.  Independent claims 9, 19, and 20 of the '853 patent contain similar "webpage element" limitations.

[84] D.I. 109 at 62; D.I. 112 at 123 4-22.  RetailMeNot represented at the *Markman* hearing that these general descriptions, including its expert's "a hierarchical component

26

The written description provides examples of a webpage element.

> The webpage 402 may include various elements . . . . For example, the webpage 402 may include a *search field* 404, a *search control* 406, *navigation tabs* 408, a *sign-up control* 410 and *login control* 412. Additionally, the webpage 402 may include *other elements*, such as a *store panel* 414, an *offers area* 416 having a *title* 418, and *various other elements* 420.[85]

The method further includes providing, if the offer identifier is not stored in the storage item, an *empty webpage element* of the merchant webpage.[86]

Examining the intrinsic record as a whole, the court determines that Honey's proposed construction is not appropriate.

With regard to the first dispute, whether the webpage element must be "from the merchant's server(s)," or can also come from other servers or computers, Honey's proposed construction effectively re-writes the phrase "webpage element *of* the merchant *webpage*" to read "webpage element *from* the merchant *server*."

The written description does not support Honey's re-write of the claims. The written description indicates webpage elements *may* be from the merchant's server(s), but does not dictate that requirement. For example, the written description recites:

> As explained below, the redemption header *may* be provided in merchant websites provided *from merchant servers* 38 to enable a user to easily view offer information after leaving the offers website from the otters engine 12 (FIG. 1).[87]

Additionally, the redemption header 446 may be retrieved asynchronously

---

of a webpage" statement, was not RetailMeNot's suggested "definition or that construction should somehow [be] told to the jury that that's what it means," it was "just [the expert] expounding upon what he understands generally ['webpage element'] to mean . . . ." *Id.* at 140:6-15.
[85] '853 patent, 17:52-59.
[86] *Id.*, 2:10-12.
[87] *Id.*, 17:9-12.

relative to loading of the merchant webpage 442 . . . . For example, web content for rendering the header 446 *may* be requested from one server, such as *the offer's engine* of FIG. 1, while *the rest of the webpage* is being requested *from a merchant server* and rendered.[88]

The second quote is explicit that certain content for the webpage element, i.e., the header, may be requested from "the offer's engine," not the "merchant server." Discussing the same embodiment, the patent discloses the "redemption header" recited in the relevant limitation is created in, not by, the merchant webpage, i.e., the redemption header does not come from the merchant servers.

Next, a *webpage element* for the *redemption header* may be created *in* the merchant webpage (block 612), such as in a document object model (DOM) associated with the merchant *webpage*. For example, in some embodiments an inline frame may be created via the HTML <iframe> tag. In such embodiments, the redemption header code may load content from the offers engine 12 within the inline frame.[89]

The court, therefore, determines the intrinsic record does not support Honey's proposed construction requiring the webpage element to be from the merchant's servers.

With regard to the second dispute, whether the webpage element is limited to elements that "display[] information and/or receive[] user input," Honey's proposal narrows the limitation by effectively adding the following italicized language to the claim: "webpage element of the merchant webpage *that displays information and/or receives user input*." This restriction is also unsupported by the intrinsic evidence.

The written description again uses permissive, rather than mandatory, language regarding display and/or receipt of user input.

_____

[88] *Id.*, 19:53-60.
[89] *Id.*, 25:40-46.

"The webpage 402 *may include* various elements *to display information to a user*, and in *some instances*, *receive user input*."[90]

There is also disclosure of an embodiment containing an empty element, wherein the user is not displayed any content.

The executable computer code further includes instructions that, when executed, cause one or more processors to perform the following: providing, if the offer identifier is not stored in the storage item, an *empty webpage element of the merchant webpage*.[91]

If the offer identifier is stored (line 618), then the offer identifier associated with the selected offer  may be read (block 620).  In contrast, if the offer identifier is not stored (line 622), then an *empty webpage element* may be provided, e.g., *no content is provided for display in the webpage elements* (block 624).[92]

Because the intrinsic record does not support either of the disputed restrictions in Honey's proposed construction, the court recommends no additional definition for this phrase and it be given the plain and ordinary meaning as expressed by the words of the claim:  "webpage element of the merchant webpage."

**H.**   "content item" / "content-item identifier" ('335 patent, claims 1, 10, 15, 18, and 31; '769 patent, claims 1, 9, 12, 21, 25, and 30)

1.   RetailMeNot's proposed construction:  plain and ordinary meaning, or "unit of information in a webpage" / "identifier of a unit of information in a webpage"

2.   Honey's proposed construction:  indefinite

3.   Court's construction:  "unit of information in a webpage" / "identifier of a unit of information in a webpage."

This term presents similar disputes as "content item" in the '688 patent and

---

[90] *Id.*, 17:52-54.
[91] *Id.*, 2:40-45.
[92] *Id.*, 25:64-26:2.

29

results in a similar determination.  The parties again cite the testimony of their experts to support their competing positions regarding whether this term is indefinite, and the court again finds them insufficient to establish by clear and convincing evidence at this stage that the term is indefinite as Honey suggests.  As explained below, the court believes the intrinsic record sufficient to inform a POSITA of the bounds of the invention.

"Content item" / "content-item identifier" is recited in exemplary claim 1 of the '335 patent.

> A tangible, non-transitory. machine-readable medium storing instructions that when executed by one or more processors effectuate operations comprising:
>
> sending, with one or more processors, via a network, from a first domain, at least part of a first webpage to a web browser executing on a user computing device, wherein sending the at least part of the first webpage comprises:
>
> causing the web browser to obtain and display a plurality of *content items* in the first webpage, each of the *content items* being associated in the web browser with a *content-item identifier* that distinguishes the content items from one another;
>
> sending, with one or more processors, via the network, from the first domain, instructions that cause the web browser to store in client-side browser-accessible storage a given *content-item identifier* associated with a given *content item* selected by a user in the first webpage, the storing being executed in response to receiving the selection of the given *content item* in the first webpage by the user; and
>
> after sending the at least part of the first webpage, and after the selection of the given *content item* is received, coordinating, with one or more processors, consistent content across domains after the web browser navigates to a second webpage from a second domain different from the first domain, wherein consistent content across domains is coordinated by:
>
> communicating the selection of the given *content item* by the user across

domains via the client-side browser-accessible storage, from content associated with the first domain to content associated with the second domain, by accessing the client-side browser-accessible storage after the web browser has navigated to the second web page; and

causing the web browser to display the second webpage concurrently with displaying information related to tile given *content item* in response to the selection of the given *content item* being communicated across domains, wherein causing the web browser to display the second webpage concurrently with displaying information related to the given *content item* comprises:

inserting browser-executable code of a redemption bar in a merchant webpage after the merchant webpage is provided to the web browser, wherein the merchant webpage is the second webpage.[93]

As was the case with the "content item" of the '688 patent, the words "content item" do not appear in the written description of the Header Patents. Honey argues this term is indefinite. RetailMeNot contends a POSITA reading the intrinsic record would understand the "content item" / "content-item identifier" have the same meaning as the "content item" of the '688 patent: "unit of information in a webpage" / "identifier of a unit of information in a webpage."

In the exemplary claim, "a plurality of content items" are each "associated with a content-item identifier that distinguishes the content items from one another" and the content items of interest are selectable: "the selection of the given content item is received." RetailMeNot states the particular content items addressed in the Header Patents are coupons.[94] It relies on Figure 4A and its related description as support.

FIG. 4A depicts a screen 400 of a web browser, e.g., an application for receiving, rendering, interaction with, and viewing web *content* in

---

[93] '335 patent, claim 1.
[94] D.I. 112 at 86:22-24.

accordance with an embodiment of the present invention.[95]

The screen 400 depicts an offers webpage 402 (a term which includes web apps having a document object model dynamically constructed client-side with AJAX requests) provided by the offers engine 12. The webpage 402 may include various elements to display *information* to a user, and in some instances, receive user input. For example, the webpage 402 may include a search field 404, a search control 406, navigation tabs 408, a sign-up control 410 and login control 412. Additionally, the webpage 402 may include other elements, such as a store panel 414, an offers area 416 having a title 418, and various other elements 420.[96]

The coupons illustrated in Figure 4A are described as follows:

The offers area 416 may *present offers, e.g., online coupons 430, for viewing and selection by a user.* The offers area 416 may include any number of offers associated with merchants providing goods, services, or a combination thereof. The offers area 416 may present offers based on ranking criteria, user selections (e.g., selections of a merchant, offer categories, etc.) or other parameters. For example, as shown in FIG. 4A, the offers area 416 depicts top ranked offers as indicated by the "Today's Top Coupons" text displayed in the title 418. Each *coupon 430* may be presented with information associated with the *coupon 430*, such as a merchant tile 432 and a descriptive text 434. Additionally, *each coupon* 430 may include a coupon code box 436 having an *offer redemption identifier, e.g., a coupon code 438*, associated with each *coupon 430*.[97]

According to RetailMeNot, the written description makes clear the content items, i.e., coupons, are discrete examples of items of content on the page, and that there are certain item identifiers that distinguish each from the other and are selectable as required by the claim.[98] The court agrees with RetailMeNot.

Thus, the court recommends construing "content item" / "content-item identifier" to mean "unit of information in a webpage" / "identifier of a unit of information in a

---

[95] '335 patent, 17:40-43.
[96] *Id.*, 17:52-62.
[97] *Id.*, 18:31-45.
[98] D.I. 112 at 87:5-10.

webpage."

    **I.**    "communicating . . . from content associated with the first domain to content associated with the second domain" ('335 patent, claims 1, 18; '769 patent, claims 1 and 30)

        1.    RetailMeNot's proposed construction:  plain and ordinary meaning

        2.    Honey's proposed construction:  indefinite

        3.    Court's construction/[determination]:  "communicating . . . from content associated with the first domain to content associated with the second domain"

The "communicating" limitations are recited in exemplary claims 1 from the '335 and '769 patents, respectively.

> *wherein consistent content across domains is coordinated by*:
>
> *communicating* the selection of the given content item by the user across domains via the client-side browser-accessible storage, from *content associated with the first domain to content associated with the second domain*, by accessing the client-side browser-accessible storage after the web browser has navigated to the second web page[.][99]
>
> *wherein consistent content across domains is coordinated by:*
>
> communicating the at least some of the content items across domains via the client-side browser-accessible storage, *from content associated with the first domain to content associated with the second domain*, by accessing, with the added program installed in the web browser, the client-side browser-accessible storage after the web browser has navigated to the second web page[.][100]

This limitation, therefore, discloses how to coordinate consistent content across domains.

RetailMeNot cites the following disclosures from the written description,

---

[99] '335 patent, claim 1.
[100] '769 patent, claim 1.

explaining the flow charts illustrated in Figures 6A and 6B, as informing a POSITA's understanding of the "communicating" limitation. The "selection of the given content item . . . from content associated with the first domain" is reflected in block 602 ("Receive selection of merchant coupon") of Figure 6A and explained by the written description:

> a selection of an online coupon from an offers website may be received (block 602). Next, an offer identifier associated with the selected online coupon may be stored in a browser-accessible storage item[.][101]
>
> [t]he website provided by the offers engine 12 responds to such a selection by, in some embodiments, transmitting a request to the appropriate affiliate-network server 44 or 46.[102]

The "via the client-side browser-accessible storage" is reflected in block 604 ("Store offer identifier in browser-accessible storage item") of Figure 6A and explained by the written description:

> The request to the affiliate-network server may include (e.g. , as parameters of the URL) an identifier of the affiliate, the offer, and the merchant, and *the returned content from the affiliate-network server may include instructions for the web browser 50 or 54 to store in memory* (e.g., in a cookie, or other form of browser-accessible memory, such as a SQLite database or in a localStorage object via a localStorage.setItem command) an identifier of the affiliate that provided the offer that was selected.[103]

The "content associated with the second domain, by accessing the client-side browser-accessible storage after the web browser has navigated to the second web page" is reflected in blocks 616 ("Is offer identifier stored") and 620 ("Read offer

---

[101] '335 patent, 25:8-12.

[102] *Id.*, 7:27-30.

[103] *Id.*, 7:33-42; *id.*, 25:14-15 ("[T]he browser-accessible storage item may he a session cookie that expires when a session ends".).

identified from data") of Figure 6B and explained by the written description:

> Next, the existence of the offer identifier in the cookie or other browser-accessible storage item may be determined (decision block 616). If the offer identifier is stored (line 618), may be read (block 620).[104]

Honey argues, however, that this claim is indefinite because the written description provides no guidance from which a POSITA would understand what it means to communicate from content associated with the first domain to content associated with the second domain, which concerns the patent's description of content.[105]

RetailMeNot notes the written description describes *content* as including *instructions* from the web browser to store in memory,[106] e.g., browser-accessible memory, or *instructions* such as those expressed in JavaScript™.[107] The written description explains information is stored in response to *instructions to store the content item identifier* and then, at the second domain, *instructions to execute* cause that content identifier to be read from the storage. RetailMeNot maintains a POSITA would

---

[104] *Id.*, 25:61-66.

[105] D.I. 112 at 147:22-148-6. According to RetailMeNot, Honey's expert did not submit a declaration on this limitation. *Id.* at 144:11-13.

[106] '335 patent, 7:33-42 ("The request to the affiliate-network server may include (e .g., as parameters of the URL) an identifier of the affiliate, the offer, and the merchant, and the returned *content* from the affiliate-network server *may include instructions for the web browser 50 or 54 to store in memory* (e.g., in a cookie, or other form of browser-accessible memory, such as a SQLite database or in a localStorage object via a localStorage.setItem command) *an identifier of the affiliate* that provided the offer that was selected.").

[107] *id.*, 5:49-56 ("Similarly, the web browser 50 may be configured to receive a website from the offers engine 12 having data related to deals and *instructions (for example, instructions expressed in JavaScript™)* that when executed by the browser (which is executed by the processor) cause the mobile user device to communicate with the offers engine 12 and facilitate user interaction with data from the offers engine 12.").

understand this communication occurs *via* client-side browser-accessible storage, e.g., *the clipboard*.[108]

The court determines Honey has not shown by clear and convincing evidence that this term is indefinite. The court recommends no additional definition for this phrase and it be given the plain and ordinary meaning as expressed by the words of the claim: "communicating . . . from content associated with the first domain to content associated with the second domain."

**J.** "automatically" ('625 patent, claims 1 and 11)

    1.    Honey's proposed construction: "without human intervention"

    2.    RetailMeNot's proposed construction: plain and ordinary meaning

    3.    Court's construction: "without human intervention"

RetailMeNot contends this term does not need construction but, if the court defines the term, it does not oppose Honey's proposal.[109] The court finds neither Honey's '625 patent nor RetailMeNot's '688 patent give "automatically" a special meaning. To avoid possible jury confusing by providing a definition of the term in the context of one patent but not the other, the court also recommends construing "automatically" to mean "without human intervention" in Honey's '625 patent.

**O.** "the list [of digital codes]" ('625 patent, claims 8.11, 15, 17, and 19)

    1.    Honey's proposed construction: "said one or more digital codes received over the public network"

    2.    RetailMeNot's proposed construction: indefinite

---

[108] D.I. 112 at 152:13-153:17.
[109] D.I. 107 at 10.

3. Court's construction/[determination]: "said one or more digital codes received over the public network"

The term "the list [of digital codes]" appears in apparatus claim 8, which depends from claim 1; in method claim 11; and in method claims 15, 17, and 19, all of which depend from claim 11.

Claim 1 of the '625 patent recites, in relevant part:

An online computer system that directly interfaces with a webpage of a third party website that causes a certain numerical value displayed on the webpage to change in value comprising:

a system coupled to a public network configured to cause the numerical value to change when *one or more digital codes* are transmitted to the third party website, wherein the one or more digital codes enable the numerical value to change;

a browser software installed on a user's device with an electronic display that is operably connected to the public network, said browser software configured to: *receive the one or more digital codes over the public network*[.][110]

Claim 8, depending therefrom, recites:

The online computer system of claim 1, wherein *the list of digital codes* is generated using at least one of the following: Naive Bayes Classifier algorithm, K Means Clustering algorithm, Support Vector Machine algorithm, linear regression, logic regression, and artificial neural networks.[111]

Claim 11 recites, in relevant part:

An electronic method for interfacing with a webpage of a third party website that causes a certain numerical value displayed on the webpage to change in value comprising:

*receiving one or more digital codes* that cause the numerical value to change when transmitted to the third party website over the public network

---

[110] '625 patent, claim 1.
[111] *Id.*, claim 8.

37

by a user's computing device via browser software;

when the user connects with the third party website and opens the webpage, altering the webpage displayed on the electronic display by dynamically generating a graphical trigger to be presented on the display;

identifying a data entry interface on the webpage to input each of *the one or more digital codes from the list*;[112]

Claims 15, 17, and 19, depending therefrom recite: "The electronics method of claim 11, . . ."

further comprising *removing digital codes from the list* that do not cause the numerical value to change[113]

wherein *the list of digital codes* is generated using at least one of the following: Naive Bayes Classifier algorithm, K Means Clustering algorithm, Support Vector Machine algorithm, linear regression, logic regression, and artificial neural networks.

wherein *the list* is generated based on historical interactions of other users with the website.[114]

RetailMeNot argues "the list" is indefinite for lack of antecedent basis because no claim recites "a list," and maintains that Honey improperly asks the court to correct this material drafting error.[115] The court rejects RetailMeNot's argument.

A lack of antecedent basis, by itself, does not demand a finding of indefiniteness. "[D]espite the absence of explicit antecedent basis, '[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.'"[116]

--------

[112] *Id.*, claim 11.
[113] *Id.*, claim 15.
[114] *Id.*, claim 19.
[115] D.I. 107 at 15.
[116] *Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006), *aff'd*, 275 F. App'x 969 (Fed. Cir. 2008); *see also In re Downing,* 754 F. App'x 988, 996 (Fed. Cir. 2018) ("But the lack of an antecedent basis does not render a claim indefinite as long as the claim 'apprises one of ordinary skill in the art of its scope and, therefore,

"[A]n antecedent basis can be present by implication."[117]  The party alleging indefiniteness based on a lack of antecedent basis has the burden to "prove by clear and convincing evidence that the lack of antecedent basis leaves one of ordinary skill in the art unable to discern the boundaries of the claim 'based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art.'"[118]

Honey argues a POSITA would reasonably understand "the list" to mean "one or more digital codes received over the public network"[119] and that an antecedent basis can shown by implication in two ways.  First, it can be implied where the claim uses different wording for the indefinite and definite forms of the element, but a POSITA would understand that they refer to the same thing.[120]  Second, an antecedent basis can be implied where a typographical error during prosecution removed explicit antecedent basis, but it is nonetheless clear to what the element refers.[121]

Honey maintains an antecedent basis is present by implication where the claim uses different wording for the indefinite and definite forms of the element.

In each of the claims, there is an apparent correlation of digital codes to the list,

---

serves the notice function required by [§ 112 ¶ 2].'"); *3G Licensing, S.A. v. Blackberry Ltd.*, C.A. No. 17-82-LPS-CJB, 2018 WL 4375091, at *6 (D. Del. Sept. 13, 2018).

[117] *Energizer Holdings*, 435 F.3d at 1371.

[118] *3G Licensing*, 2018 WL 4375091, at *6 (quoting *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011)).

[119] D.I. 107 at 12.

[120] *Id.* at 31 (citing *Energizer Holdings*, 435 F.3d at 1369 (holding that "an anode gel comprised of zinc as the active anode component" provided sufficient antecedent basis for the term "said zinc anode")).

[121] *Id.* at 32 (citing, e.g., *Masimo Corp. v. Philips Elecs. N. Am. Corp.*, No. 09-080-LPS-MPT, 2013 WL 4870869, at *6 (D. Del. Aug. 29, 2013) (term "said scan" is not insolubly ambiguous because even though the antecedent was "a scan module . . . to scan" prosecution history showed that the patentee "renamed 'the scan module' to be a 'an analysis module'")).

39

internally with respect to independent claim 11, and through dependency with respect to

dependent claims 15, 17, and 19; and through dependency from claim 1 in claim 8.  As

Honey notes, with respect to the claims at issue, "the list" and "digital codes" are the

only two concepts associating with each other and used interchangeably.[122]

Honey next points to the written description which also shows the correlation and

interchangeability of one or more codes and a list.

> After acquiring the *list of code(s)* and configuration information on *how to apply them*, the computer-implemented system begins systematically applying the code(s) to the electronic commerce platform, either one at a time or more than one at a time (assuming the electronic commerce platform supports such an action).[123]

> The computer-implemented systems described herein automate certain aspects of the payment process to improve the experience of the consumer. For example, a computer implemented system can *retrieve a list of code(s)* and *then apply the code(s)* in accordance with configuration information that specifies how to apply the code(s) to the electronic commerce platform.[124]

> Accordingly, responsive to determining that the consumer has interacted with the button, the browser extension may retrieve *a machine-readable list of code(s)* and/or configuration information for the electronic commerce platform (step 905).[125]

Based on the consistency of the claim language and the written description

correlating codes and the list, and their interchangeable use, Honey contends a

POSITA would reasonably understand "the list" to mean "one or more digital codes

received over the public network."[126]  The court agrees with Honey's contention.

---

[122] D.I. 112 at 165:5-10.
[123] '625 patent, 2:66-4:5.
[124] *Id.*, 5:47-51.
[125] *Id.*, 14:12-16.
[126] "The definiteness inquiry 'focuses on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the

Honey also contends an antecedent basis may be implied where a typographical error during prosecution removed explicit antecedent basis but it is nonetheless clear what the element refers to.[127]  In support of this argument, Honey refers the court to the prosecution history.

The lack of antecedent basis for "the list" occurred during prosecution when claim 1, initially reciting "a list of digital codes," was amended to delete that term and re-written to recite "one or more digital codes" instead.[128]

> a ~~server~~ system coupled to a public network configured to ~~store a list of digital codes that~~ cause the numerical value to change when <u>one or more digital codes are</u> transmitted to the third party website, wherein the ~~list is generated based on historical data collected for the website about whether~~ one or more digital codes enable the numerical value to change[.][129]

Dependent claim 8, reciting, "wherein *the list of digital codes* is generated using at least one of the following . . ." remained unchanged during prosecution.  The original claim's

---

specification.'"  *Energizer Holdings*, 435 F.3d at 1370 (citation omitted).  *See also Wisconsin Alumni Res. Found. v. Apple, Inc.* No. 14-62-WMC, 2015 WL 4668247, at *18 (W.D. Wisc. Aug. 6, 2015) ("The specification can, however, provide sufficient context for a person skilled in the field of the art to understand the claim to render it definite.") (citing *In re Skvorecz*, 580 F.3d 1262, 1268 (Fed. Cir. 2009)); *see also Joy MM Delaware Inc. v. Cincinnati Mine Mach. Co.*, 2010 WL 3984822, at *4 (W.D. Pa. Oct. 9, 2010) (finding "[a]n antecedent basis is present by implication by reference to the specification, figures, and claims").

[127] *See, e.g.*, *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (stating that if a correction is not subject to reasonable debate based on consideration of the claim language and the written description and a different interpretation is not suggested by the prosecution history, the court may correct a typographical error).

[128] This amendment, which also removed "server" as antecedent basis for dependent claims 5, 7, and 16, discussed below, was not made to distinguish prior art.

[129] D.I. 67-3, ex. 10 (07/23/2018 Claims at 2) at 3.  Original claim 11 was also amended to remove reference to a server.  *Id.*, ex. 10 (07/23/2018 Claims at 4-5) at 5-6.

explicit antecedent basis makes clear what "the list" was referring to. Honey contends a POSITA reviewing the prosecution history would understand that reference because there is no other list referred to other than the one associated with the one or more digital codes.[130]

RetailMeNot also argues that the list must be ordered, and the term is indefinite for lack of written description explaining how to accomplish such ordering. Because the intrinsic evidence does not reveal an ordering requirement, only that the list may be ordered, the court rejects RetailMeNot's argument.[131]

The court determines RetailMeNot has not shown by clear and convincing evidence that this term is indefinite. Honey has shown antecedent basis is implied and that a POSITA reading the intrinsic record would understand the scope of the claims.[132] Thus, the court recommends that "the list [of digital codes]" be construed to mean "said one or more digital codes received over the public network."

**O.** "the server" ('625 patent, claims 5, 7, and 16)

---

[130] D.I. 112 at 167:16-171:19.

[131] *See, e.g.*, '625 patent, 3:54-62 ("*In some embodiments* . . . the remote server returns a prioritized ordering of the list"); *id.*, 6:46-50 ("[T]he browser *can deliver* feedback on which code(s) work . . . . Such feedback allows the computer-implemented system to optimize the list of code(s) that are delivered to consumers."); *id.*, 5:41-44 ("The list of code(s) *may be intelligently arranged* based on information about a consumer's shopping cart and/or data previously collected about the effectiveness of the code(s)."). At the *Markman* hearing, RetailMeNot acknowledged original claim 11 included the concept of ordering with the requirement that "the server is further configured to *sort the list* based on said data" but that concept was removed with the amendment deleting reference to a server. D.I. 112 at 181:11-17; D.I. 67-3, ex. 10 (07/23/2018 Claims at 4-5) at 5-6. The court, therefore, disagrees with RetailMeNot that the concept of ordering rebuts Honey's position regarding the correspondence of digital codes and the list.

[132] *See, e.g.*,

1.      Honey's proposed construction:  "a server that transmitted said one or more digital codes over the public network"

2.      RetailMeNot's proposed construction:  indefinite

3.      Court's construction/[determination]:  indefinite

Claims 5 and 7 depend from claim 1 and recite:

The online computer system of claim 1, wherein *the server* is configured to remove digital codes that do not cause the numerical value to change.[133]

The online computer system of claim 1, wherein the server further includes configuration instructions that specify how the digital codes are applied to the webpage.[134]

Claim 16 depends from claim 11 and recites:

The electronic method of claim 11, wherein *the server* further includes configuration instructions that specify how the digital codes are applied to the webpage.[135]

As with disputed term "the list," RetailMeNot argues "the server" is indefinite for lack of antecedent basis because no claim recites "the server," and maintains that Honey improperly asks the court to rewrite the dependent claims to reintroduce the term "server" that was removed during prosecution.[136]

These claims require "the server" to perform tasks related to transmitting and processing "digital codes."  As discussed above, "server" was removed from the independent claims during prosecution.

Honey again contends the written description supports its construction.

---

[133] '625 patent, claim 5.
[134] *Id.*, claim 7.
[135] *Id.*, claim 16.
[136] D.I. 107 at 29.

43

For example, upon reaching the homepage of a merchant, *the browser extension may submit a request to a remote server for the code(s) and/or configuration information corresponding to the merchant.*[137]

For example, upon reaching the home webpage of the electronic commerce platform, *the browser extension may submit a request to a remote server for a machine-readable list of code(s) and/or configuration information* associated with the electronic commerce platform.[138]

Honey again points to the prosecution history showing the deletion of the "server" from original claim 1 that removed the antecedent basis for "the server" of the dependent claims.

> a ~~server~~ system coupled to a public network configured to ~~store a list of digital codes that~~ cause the numerical value to change when <u>one or more digital codes are</u> transmitted to the third party website, wherein the ~~list is generated based on historical data collected for the website about whether~~ one or more digital codes enable the numerical value to change;
>
> a browser <u>software</u> ~~extension~~ installed on a user's device with an electronic display that is operably connected to ~~the server system over~~ the public network, said browser <u>software</u> ~~extension~~ configured to:
>
> > receive the ~~list of~~ <u>one or more</u> digital codes ~~from the server system~~ over the public network;[139]

Claims 5 and 7, dependent from claim 1, remained unchanged during prosecution, reciting "wherein *the server* is configured to remove digital codes that do not cause the numerical value to change," and "wherein *the server* further includes configuration instructions that specify how the digital codes are applied to the webpage,"

---

[137] '625 patent, 6:9-13.

[138] *Id.*, 13:46-51.

[139] D.I. 67-3, ex. 10 (07/23/2018 Claims at 2) at 3. Original claim 11 was also amended to remove reference to a server. *Id.*, ex. 10 (07/23/2018 Claims at 4-5) at 5-6. Original claim 11 was also amended to remove the server limitation. Claim 16, dependent from claim 11, also remained unchanged during prosecution.

respectively.[140]

Originally, claim 1 recited "a server" that transmitted digital codes "over a public network."  The dependent claims always referenced "the server."  Honey contends that a POSITA examining the intrinsic record would understand "the server" to mean "a server that transmitted said one or more digital codes over the public network."

The prosecution history does reveal antecedent basis for "a server" prior to amendment, with the dependent claims referring to "the server."  The court agrees with RetailMeNot, however, that with this amendment the applicant altered the scope and focus of the claims by intentionally removing "the server" from the independent claims.[141]  Removal of this term did not accompany its replacement by another term that might provide antecedent basis by implication.[142]  After "the server" was deleted, the issued claims do not indicate which of the multiple disclosed servers must meet the recited limitations.[143]  Here, the court find Honey's proposed construction improperly asks the court to re-introduce what the applicant affirmatively removed during prosecution.[144]

---

[140] '625 patent, claims 5 and 7.

[141] D.I. 107 at 35, 41.

[142] RetailMeNot notes Honey's argument that this term is definite does not suggest antecedent basis is present by implication, unlike its argument for the term "the list." *Id.* at 36 n.18.  *See id.* at 38 (Honey arguing:  "[a]t most, the dependent claims' recitation of 'the server' rather than 'a server' is an 'obvious administrative or typographical error' that this Court may correct.") (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1216 n. 8 (Fed. Cir. 2008)).

[143] *Id.* at 42 (RetailMeNot citing to three different servers described as playing different roles and suggesting each of these servers could be operated by different entities) (citing '625 patent, 6:9-13, 13:46-51; 6:46-50; and 9:53-57).

[144] *See United States v. Telectronics*, 857 F.2d 778, 783 (Fed. Cir. 1988) ("[C]ourts are not permitted to read back into the claims limitations which were originally there and were removed during prosecution of the applications through the Patent

The court does not agree the lack of antecedent basis is an "obvious administrative or typographical error" that this court may correct as Honey suggests.[145] A district court may correct a patent if "'(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'"[146] There is no debate that the issued claims do not provide explicit antecedent basis for "the server" of the dependent claims. There is a reasonable debate, as RetailMeNot posits, as to whether the applicant intended to remove "the server" from the dependent claims when he removed the term from the independent claims, and/or as to which of the servers identified in the written description meet "the server" limitation.[147]

The court determines RetailMeNot has carried its burden of showing this term is indefinite. Thus, the court recommends that "the server" be found indefinite.

## V.    RECOMMENDED DISPOSITION

### Order:  The Court's Claim Construction

At Wilmington, this 27th day of November, 2019, having heard oral argument, having reviewed the papers submitted with the parties' proposed claim constructions, and having considered all of the parties' arguments (whether or not explicitly discussed herein);

The court recommends the district court construe the stipulated term, and the

---

Office.") (internal quotation marks and citation omitted).

[145] *Id.* at 38.  Honey does not contend the deletion of antecedent basis for "the server" was a typographical error; it states that issue is irrelevant.  *Id.* 40.

[146] *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (citations omitted).

[147] D.I. 107 at 42.

disputed terms, as follows:

| Claim Term | Court's Construction |
|---|---|
| **RetailMeNot Patents** | |
| **'853 patent stipulated terms** | |
| "selection of one of the plurality of offers"  ('853 patent) | "selection of one of the plurality of electronic coupons." |
| "offer redemption identifier" / "offer identifier"  ('853 patent) | "identifier associated with an offer that enables or describes the redemption of the offer" |
| **'853, '335, and '769 patents stipulated term** | |
| "website"  ('853, '335, and '769 patents) | "a collection of [. . .] webpages" (noun) or "[. . .] of a collection of webpages" (adj.)" |
| **'688 patent stipulated term** | |
| "automatically" | "[copy[] the coupon code and send [] a second serve request] without human intervention" |
| **Disputed Terms** | |
| "feedback portion"  ('688 patent, claims 1-2) | "part of the webpage inviting user input" |
| "[feedback portion] indicative of historical user's views on the content"  ('688 patent, claim 1) | "indicative of historical user's views on the content" |
| "display portion overlaid with a coupon code and a flash object or other object"  ('688 patent, claim 1) | "a coupon code and a flash object or other object together overlaying a part of the displayed webpage" |
| "secure sandbox"  ('688 patent, claim 1) | "environment with restricted privileges which at least prohibits access to the clipboard of the client computing device" |

| Claim Term | Court's Construction |
|---|---|
| "content item"<br><br>('688 patent, claim 1) | "unit of information in a webpage" |
| "webpage"<br><br>('853 patent, claims 1-2, 4-5, 7, 10, 15, 17, and 19; '335 patent, claims 1, 9-12, 15, 18, 25, 27-28, and 31; '769 patent, claims 1, 3, 5, 11-14, 20-21, 25, and 30) | "a collection of resources to be rendered by the browser and associated plug-ins, including execution of scripts, such as JavaScript™, invoked by the webpage" |
| "webpage element of the merchant webpage"<br><br>('853 patent, claims 1, 9, and 19-20) | "webpage element of the merchant webpage" |
| "content item"; "content-item identifier"<br><br>('335 patent, claims 1, 10, 15, 18, and 31; '769 patent, claims 1, 9, 12, 21, 25, and 30) | "unit of information in a webpage" / "identifier of a unit of information in a webpage" |
| "communicating . . . from content associated with the first domain to content associated with the second domain"<br><br>('335 patent, claims 1, 18; '769 patent, claims 1, 30) | "communicating . . . from content associated with the first domain to content associated with the second domain" |
| **Honey Patent** ||
| **Disputed Terms** ||
| "automatically"<br><br>('625 patent, claims 1 and 11) | "without human intervention" |
| "the list [of digital codes]"<br><br>('625 patent, claims 8, 11, 15, 17, and 19) | "said one or more digital codes received over the public network" |

| Claim Term | Court's Construction |
|---|---|
| "the server"<br><br>('625 patent, claims 5, 7, and 16) | indefinite |

Pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), FED. R. CIV. P. 72 (b), and D. DEL. LR 72.1, any objections to this Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same. Any response shall be limited to ten (10) pages and filed within fourteen (14) days thereafter.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov.)

Dated: 11/27/19       /s/  Mary Pat Thynge
               CHIEF U.S. MAGISTRATE JUDGE